No. 01-14- 00880- CV

# In the Court of Appeal for the
# First District of Texas

FILED IN
1ST COURT OF APPEALS
HOUSTON, TEXAS

AUG 0 5 2015

CHRISTOPHER A. PRINE

CLERK _____

**THEAOLA ROBINSON,**

**Appellant**

**vs**

## THE WALT DISNEY COMPANY, ABC TELEVISION NETWORK, INC., CC TEXAS HOLDING COMPANY, INC., AND KTRK TELEVISION, INC.

**Appellees**

On appeal from the 234th Judicial District Court for Harris County,
Cause No.1154895, Honorable Mauricio Reece Rondon and Wesley Ward

## APPELLANT'S OBJECTION AND RESPONSE TO APPELLEES' MOTION TO DISMISS FOR LACK OF JURISDICTION AND VEXATIOUS LITIGANT

Respectfully submitted,

THE AOLA ROBINSON
**5505 JENSEN DRIVE
HOUSTON, TEXAS 77028
PHONE: 832-250-4444
PRO SE**

**APPELLANT'S OBJECTION AND RESPONSE TO APPELLEES'
MOTION TO DISMISS FOR LACK OF JURISDICTION AND
VEXATIOUS LITIGANT**

**Respectfully submitted, Theaola Robinson, 5505 Jensen Drive, Houston,
Texas 77028, Telephone: (832) 250-4444, email: benji's@wt.net, Pro Se.**

TO THE HONORABLE JUDGE OF SAID COURT:

Appellant Robinson asks the Court to deny Appellees' motion to dismiss the appeal and reverse and remand the trial court decision for attorney fees and the decision of this Court pursuant to *Wall v. Wall,* 143 Tex. 418, 186 S.W.2d 57 (1945). This Court should hear this case because, as everyone acknowledges, there are First Amendment and statutory construction issues before the Court. Appellees have led the court of appeals into error during the first appeal. It is a holding unsound in Constitutional law. The first appeal was an untimely appeal filed by Appellees and the issues were appellate jurisdiction and evidence. Based on the incomplete record before it at the time of the first appeal, and because of the newly enacted TCPA statute the court of appeals rendered an opinion that is void by operation of law. The second appeal was filed by Appellant on October 28, 2014. The issues in the second appeal are unconstitutional attorney's fees awarded pursuant to the newly enacted Texas Anti-Slapp law and the applicability of the TCPA to Appellant Robinson's First Amendment cause of action which is a question of fact.

2

## A. INTRODUCTION

1. Appellant is Theaola Robinson; Appellees are The Walt Disney Company; ABC Television Network, Inc.; CC Texas Holding Co., Inc.; and KTRK Television, Inc.

## B. ARGUMENT & AUTHORITIES

2. Although the Court has the authority under Texas Rule of Appellate Procedure 42.3(a) to dismiss an appeal for lack of jurisdiction, this is not a case in which the Court should do so because of statutory construction of the Texas Citizens Participation Act, Chapter 27 of the Texas Civil Practice and Remedies Code (TCPA) which conflicts with Texas appellate and constitutional law. It is a fact at the time of Appellees' Motion to Dismiss under the act Appellant Robinson's "legal proceeding" was filed prior to the enactment of the TCPA. *See Appellees' Motion to Dismiss for Lack of Jurisdiction.* Statutory construction is a question of law. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex. 2006). The TCPA defines a "legal action" as a "lawsuit, cause of action, petition, complaint, cross-claim or counterclaim or any other judicial pleading or filing that requests legal or equitable relief." *See Tex. Civ. Prac. & Rem. Code Ann. § 27.001(6).* "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex. 2011).

3

Appellant Robinson's argue that this expansive definition refers to "more than just [a] lawsuit," so that the TCPA applies whenever a pleading in *any case* (state or federal) makes a claim that could be construed as a SLAPP claim, even if the plaintiff commenced the lawsuit before the effective date of the TCPA. The legislature dictated that the TCPA "be construed liberally to effectuate its purpose and intent fully" which it stated was "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *See Tex. Civ. Prac. & Rem.Code Ann. §§ 27.002, 27.011(b).* Therefore, Appellant Robinson asks this Court to deny Appellees motion to dismiss for lack of jurisdiction and apply the statutory language of the TCPA defining a legal proceeding. *See Tex. Civ. Prac. & Rem. Code Ann. § 27.001et seq.*

3. The Court should deny Appellee's motion to dismiss this appeal reverse and remand the trial court decision for attorney fees and the decision of this Court because the judgment is final and appealable. *See Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 510 (Tex. 1995). Because Texas adheres to the final judgment rule, appellate courts often address the finality of a judgment *sua sponte. See Dallas County Appraisal Dist. v. Funds Recovery, Inc.,* 887 S.W.2d 465, 468 (Tex. App.-Dallas, 1994, writ denied) (explaining that the appellate court must

inquire into its own jurisdiction, even if it is necessary to address it *sua sponte*). Here, although finality of the trial court's judgment was never seriously in question, Robinson's motion for new trial and briefs asserted that "the Court's 'Final Judgment' is not final because it does not dispose of all claims and all parties and the TCPA does not apply to legal proceeding. There is no question that Judge Wesley Ward, the trial court judge in second appeal for attorney's fees, signed a final judgment on October 8, 2014 under the TCPA and there is no question that Judge Rondon Reece, the trial court judge in first appeal signed on February 12, 2012 a nonappealable interlocutory order. *See Appellant's Brief.*

4. The Court should deny Appellee's motion to dismiss this appeal or reverse and remand the trial court decision for attorney fees and the decision of this Court because appellant timely perfected an appeal. *See Quanaim v. Frasco Rest. & Catering*, 17 S.W.3d 30, 40 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

5. The Court should deny Appellees' motion to dismiss this appeal or reverse and remand the trial court decision for attorney fees and the decision of this Court because Appellant Robinson due process is/was hindered do to Appellees describing Appellant Robinson as a vexation litigant. The vexatious litigation statute by its terms does not apply to post-judgment proceedings; rather, to declare a litigant as vexatious, a motion must be filed in a pending case. *In re Florance,*

5

377 S.W.3d 837 (Tex. App. Dallas 2012). Appellees' vexatious litigant motion is an enforcement judgment in disguise. Appellant Robinson has/is exercise her constitutional right to petition the court for redress. Appellant Robinson is/was the prevailing party in the original legal proceeding. Robinson should not now have to lose her appellate rights because the court of appeals and Appellees later found that its original decision was erroneous. *See Briscoe v. Goodmark Corp.,* 102 S.W.3d 714, 717 (Tex. 2003). Therefore, just like Briscoe, Appellant Robinson is/was doing everything to preserve her right to petition for redress and is not a vexatious litigant. *Id.*

6. Appellant Robinson attaches an affidavit to this response to establish facts that are not included in the appellate record, are not known to the Court in its official capacity herein incorporated as *Exhibit A.* As the Court is aware, the TCPA is designed to protect individuals whom are exercising their First Amendment Rights to right to petition the Court and seek redress and other constitutional issues such as a right to jury trial in both cases.

7. Appellant Robinson's legal proceeding was filed prior to the enactment of TCPA. The only relevant pleadings included in the appellate record are the original trial court Facts and Conclusion of Law by Judge Rondon, Walt Disney's/KTRK Channel 13 Motion to Dismiss under the TCPA, and this Court opinion. There is no reporter record or court reporter record on Appellees'Motion

6

for Summary Judgment for attorney's fees. *See Exhibit A.* For the first time on appeal, Appellant Robinson has asserted that the attorney's fees awarded under the Texas Anti-Slapp statute are unconstitutional and her defamation cause of action was filed on September 2010 in federal court. A decision rendered on an issue before the appellate court does not absolutely bar re-consideration of the same issue on a second appeal. The court of appeals had the authority to re-visit its jurisdictional decision. *See Briscoe v. Goodmark Corp.,* 102 S.W.3d 714, 717 (Tex. 2003). Therefore, the Court should hear Appellant Robinson's appeal and not be bound by the "law of case doctrine." *See Trevino v. Turcotte,* 564 S.W.2d 682, 685 (Tex. 1998).

8. Although the Court has the authority under Texas Rule of Appellate Procedure 42.3(c) to dismiss an appeal if the appellant does not comply with a requirement of the Texas Rules of Appellate Procedure, this is not a case in which the Court should do so because of the constitutional issues that are at stake and it will go against this Court duty to preserve the citizens of Texas inalienable rights granted by the United States and Texas Constitution. *See Conn. Gen. Life Ins. Co.,* 219 S.W.2d at 800. The purpose of the TCPA is "to encourage and safeguard the *constitutional rights* of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for

demonstrable injury." *See Tex. Civ. Prac. & Rem. Code Ann. § 27.002.* All governmental powers are to protect those rights including the First Court of Appeals. "The most sacred duty of government is to do equal and impartial justice to all its citizens, said Thomas Jefferson."

9. The Court should deny Appellees' motion to dismiss because Appellant Robinson is attempting to comply with the rules and clerk's instruction. Tex. R. App. P. 42.3(c). Appellant Robinson has diligently attempted to comply with the rules of court by sending any documents filed with the Court via email to Appellees' attorney. *See Exhibit A.* Appellees base their Motion to Dismiss solely on claims that this court lacks jurisdiction and plenary power to hear Robinson's appeal. In the first appeal, Appellees issue was this Court jurisdiction to hear Appellees' appeal under the TCPA prior to 2013 amendment. *See Scherr v. Oyedokum,* 889 S.W.2d 546, 549 (Tex. App.-Houston [14th Dist.] 1999, no writ) (noting that "[i]t is fundamental error for this Court to assume jurisdiction over an interlocutory order when not expressly authorized by statute to do so"). Now, Appellees would like the court to dismiss Appellant Robinson's appeal for lack of jurisdiction under the same statute awarding attorney's fees. Furthermore, a court of appeals must not affirm or reverse a judgment or dismiss an appeal for formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or irregularities. Tex. R. App. P. 44.3(c). Therefore,

Appellant Robinson asserts that she be allowed to amend notice of appeal in the interest of justice and deny Appellees' motion to dismiss for lack of jurisdiction.

## C. CONCLUSION

The TPCA is not designed or intended to be used to hinder the right to petition the court for redress. Appellees attempt to escape liability from Appellant's First Amendment claim is disingenuous and should be met with sanctions from this Court. Under the TCPA pursuant to § 27.009(b), if the Court finds that a motion to dismiss filed under this chapter is frivolous or solely intended to delay, the Court may award court costs and reasonable attorney's fees to the responding party. Where the previous opinion addressed issues in the summary judgment context, concluded that genuine issues of material fact precluded summary judgment and did not make a legal holding regarding the sufficiency of the applicability of TCPA. *See Hahn v. Love,* 394 S.W.3d 14 (Tex. App. Houston 1st Dist. 2012), review denied, (Feb. 1, 2013). Therefore, Appellees should be sanctioned for their attempted abuse of the TCPA and for blatantly stalling this litigation and their motion to dismiss should be denied.

## D. PRAYER

For these reasons, Appellant asks the Court to deny Appellees' motion and continue with this appeal and the applicability of TCPA and the law of case doctrine does not apply.

9

Respectfully submitted,

THEAOLA ROBINSON
5505 JENSEN DRIVE
HOUSTON, TEXAS 77028
PHONE: 832-250-4444

## CERTIFICATE OF SERVICE

In accordance with the Texas Rules of Appellate Procedure I certify that a copy of this Appellant's Brief was served on Appellees The Walt Disney Company, ABC Television Network, Inc., CC Texas Holding Company, Inc., and KTRK Television, Inc. through counsel of record, Laura Lee Prather of Haynes & Boone by U.S. Mail certified mail, via email, and facsimile on August 3, 2015.

Respectfully submitted,

THEAOLA ROBINSON
5505 JENSEN DRIVE
HOUSTON, TEXAS 77028
PHONE: 832-250-4444

EXHIBIT A   THEAOLA ROBINSON ADFFIDAVIT

No. 01-14- 00880- CV

In the Court of Appeal for the
First District of Texas

THEAOLA ROBINSON,
Appellant
vs
THE WALT DISNEY COMPANY, ABC TELEVISION NETWORK, INC., CC TEXAS
HOLDING COMPANY, INC., AND KTRK TELEVISION, INC.
Appellees

On appeal from the 234th Judicial District Court for Harris County,
Cause No.1154895, Honorable Mauricio Reece Rondon and Wesley Ward

APPELLANT'S AMENDED NOTICE OF APPEAL

Respectfully submitted,

THE AOLA ROBINSON
5505 JENSEN DRIVE
HOUSTON, TEXAS 77028
PHONE: 832-250-4444
PRO SE

**Amended NOTICE OF APPEAL**

Pursuant to Texas Rule of Appellate Procedure 25.1, and 44.3 Theaola Robinson, Plaintiff in the above-styled and numbered action, files this notice of appeal to First Court of Appeals. Plaintiff desire to appeal from the judgment rendered against Plaintiff by the 234th Judicial District Court of Harris County, Texas on October 8, 2014.

**Dated: August 3, 2015**

Respectfully submitted,

/s/

**Theaola Robinson**
**5505 Jensen Drive**
**Houston, Texas 77028**
**832-250-4444**
**benji's@wt.net**

**CERTIFICATE OF SERVICE**

In accordance with the Texas Rules of Appellate Procedure I certify that a copy of this Notice of Appeal was served on Respondent KTRK Channel 13 through counsel of record, Laura Lee Prather of Haynes & Boone by US. Mail certified mail, via email, and facsimile on **August 3, 2015.**

Laura Lee Prather
State Bar No. 16234200

Catherine Lewis Robb
State Bar No. 24007924
Haynes and Boone LLP

600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Facsimile: (512) 867-8470
Email: laura.prather@haynesboone.com

Respectfully submitted,

/s/

**Theaola Robinson**
**5505 Jensen Drive**
**Houston, Texas 77028**
**832-250-4444**
**benji's@wt.net**

## EXHIBIT A

## BENJI'S SPECIAL EDUCATIONAL ACADEMY
## AFFIDAVIT STATEMENT OF FACT

BEFORE ME, the undersigned authority, on this day personally appeared Theaola Robinson known to me to be the person whose name is subscribed below and after having been duly sworn, on her oath stated as follows:

My name is Theaola Grimble Robinson. I am over the age eighteen a (18) years. I have never been convicted of a felony, or a crime involving moral turpitude, and under no disabilities. I am fully competent and qualified to make this affidavit. Each of the statements in this affidavit is within my personal knowledge and is true and correct.

__Theaola Robinson__      Date __08/03/2016__

### Benji's Special Educational Academy History

Benji's Special Educational Academy (BSEA) Inc. was founded in 1980, by Mrs. Theaola Robinson. The school was organized as a non-profit facility to provide care and education for Special Needs children. The school was named after my youngest son Benjajuain Chandler affectionally called "Benjie". At the age of three (3) Benjie, fell and ruptured a vessel in his head that bled on his brain which caused moderate brain damages. After the accident, Benjie was diagnosed as being "mental Retarded." I was unable to locate a day care for him because of his seizures. During the early 80s programs were not readily available for special need children. I struggled and cried many tears trying to find someone to keep my son while I went to work. Being a single mother with two other children was difficult. I purposed in my heart to ensure that my son would become successful. I developed a special individualized educational learning plan and began to teach him at home. I noticed his progress socially, physically, mentally and emotionally, developing to a great magnitude. I believed and say so very often, "If Benjie can be successful, and other children can be successful as well". It is my philosophies that "if one must judge; judge by their abilities not their disabilities".

The focus of the school was to provide care and education for other children like Benjie, who needed help and support to become productive citizens in our society. Benji's Special Educational Academy was also organized to aid in the development of fragile children who required special attention in the areas of emotional, physical, mental, academics support and for those children who are economically at-risk of not getting a proper education to succeed.

1

It is my goal to allow special need children the opportunity to become productive citizens during and after high school and not wards of the state or to be dismissed from society.

It is a rewarding experience to have the privilege of aiding in the success of the special needs individuals for thirty years without any complaints. Special needs children have no mentors but it's even more rewarding to be a mentor. Arose from humble circumstances but remained philosophical about the success of the school "I felt that this was what I was assigned by God to do "Help heal the hurt of humanity".

Unlike Mrs. Prather I don't have a long vitae, I am not a lawyer nor did I write the anti Slapp law that was designed to allow the media to defame citizen's character, reputation, trust and participation in their communities, their families and church and call it "frivolous". This is not a fight for materialistic values, but survival of life, liberty and "Justice for all".

### "Vexatious litigant"

In reading Mrs. Prather motion to declare Mrs. Robinson "Vexatious litigant" she stated "Mrs. Robinson filed for an extension because of a family illness made her unable to timely file her brief but she filed a lawsuit aganist Texas Education Agency and the City of Houston clearly indicating that she had time to spend on her legal matters" This is out of order, Mrs. Prather cannot control my time nor how it is spent.

Mrs. Prather "vexatious litigant motion" and reading TEA emails, it proves and established actual malice. Mrs. Prather also stated "Mrs. Robinson complaint was they closed down her school" Of course it was not TEA school to close, Benji's was thirty years old and we only communicated with TEA for ten years. So yes it was and is my school. TEA actions were of malice and as Dr. Hooper at TEA stated in his email to Ronald Rowell at TEA "she thinks she started this school but we need to show her (Mrs. Robinson) who runs things".

Now to add insult to the injuries on July 26, 2015 I received a motion that stated "Appellee KTRK Television, INC's motion to dismiss Appellant's Appeal and request to declare Appellant Robinson's a Vexatious Litigant". In Reading the definition of **Vexatious litigant** it is a legal action which is brought, regardless of its merits, solely to harass or subdue an adversary. . This is neither a frivolous, vexatious nor a meaningless case. Evidence (emails exhibit D) has been admitted to prove an abusive plot of destruction. There is proof that there was no question from TEA "where the money went". This was the story Channel 13 created for news story. This case has never been frivolous and now she want to declare me a vexatious litigant. I am only defending my rights. This actual applies to Mrs. Prather and KTRK.

I recall as a child reading from torn and/or missing pages of our History books given to our school after being used by the Caucasian school. I read "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness and an individual is innocence until proven guilty".

That statement is one of the best-known sentences in the English language and contains the most potent and consequential words in American history on human rights. Abraham Lincoln made it the centerpiece of his rhetoric in the Gettysburg Address of 1863, and his policies.

## Extensions

During the onset of this case Mrs. Prather seeked an extension to care for her twins, I had no objection because I am a mother as well who has struggled thirty years to provide the best care and education for my special need child and many other children with the same disadvantaged as my son. .

Mrs. Prather is well aware that her pursuit in this case is wrong. Again on July 27, 2015 Mrs. Prather file for an extension and was granted but I made no speculation on what or why she needed an extension. Does the statement "all men are created equal" apply to Mrs. Prather or not? But I am being personally attacked by Mrs. Prather on every side.

Mrs. Prather not only is the counselor defending the media that intentional created false allegation to air a story that destroyed the reputation of the special need school and its founder Mrs. Robinson with no remorse, but believe it's a victory. Again I am within my Constitutional Rights in the pursuit of happiness, my innocence, to be respected as a citizen and not be abused by the media and Governmental authorities. Mrs. Prather has taken this lawsuit personally, by writing her personal opinions. Mrs. Prather is not seeking the truth but continue to cover up the truth and the opportunity for me to prove this is a defamation lawsuit that does not qualify for the Anti-Slapp Act. To what extent will Mrs. Prather go, to win her case even though it's based on created false allegations by TEA and Channel 13?

## The Tragedy

The tragedy of these false allegations and intentional plot of destruction by governmental agencies and **media abuse** affected and destroyed many lives. Because of the intentional, immediate, takeover of the school without warning, my second son who was employed since 1985, was unable to find employment which resulted in the loss of his home, automobile, wife and children. Afterward, for three years he suffered and struggled with major depression. Finally he suffered a major stroke and today he is paralyzed and unable to function. The stress from TEA abuse of their authority and

3

channel 13 false allegations that destroyed our only source of income and respect in our community we are characterized as "thieves". Please see the court report Exhibit B.

Ms. Prather stated "we aren't responsible for what the viewers said. They're upset about that". Yes I am upset, I've lost thirty years of hard work, my son's life is destroyed, my children at Benji's was scattered and has been give the wrong impression of their mentor Mrs. Robinson. The viewers would appreciate the truth, an apology to Mrs. Robinson, the students and the parents. But Channel 13 reported untrue information. For example, if the media story caused the viewer to make negative statement about Mrs. Prather, wouldn't she be upset knowing the information was false? "Just stand in my shoes"

Mrs. Prather manipulation of the truth, the court and TEA cruelty and abuse has induced so much pain and distress until I feel empty, like someone reached in and pulled out my guts. I feel hurt, walked on, and lied on. I've been defamed, abused and feel less than a person for trying to help heal the hurt of humanity." This is what Mrs. Prather, Channel 13 TEA and others political individuals has done. Day by day I watch my son deteriorate because of the cruel and deceptiveness that has been done to my family, to simple win a case and takeover our school based of false allegations is malice.

## Court Report

Mrs. Prather quoted "Practice and Remedies Code that talk about fair report and fair comment. And we have established that this was a fair comment on a matter of public concern, and that there were reports on governmental proceedings. Both of those are protected under Chapter 73." How can falsifying information and omission of the truth be consider "fair"? There is nothing fair about this case and it certainly does not apply nor qualify as an anti-Slapp Act. It is considered an unfair, unethical and disadvantage to Mrs. Robinson and business disparagement. I agree that the public should know how tax payers' funds are being spent but when the media make up their own false information just to have a story and destroy a citizen's reputation and character "that is defamation". Mrs. Prather is well aware of the truth but she trying to make the court believe the story that was told to the citizens in Texas by Channel 13 which has portrayed me as a thief, a monster and the administrators of Benji's as poor manager. Mrs. Prather also stated "that there was repeated financial mismanagement. Not true please see audit report in see audit Exhibit C.

"Throw her in jail she is a thief". This statement is actual one of the 63 negative statement perceived of me by the viewers. If this is not destroying my reputation please tell me what is? This is the burden of bringing a prima facie case that she speaks about in the court report.

4

In the Court Report, Mrs. Prather alluded that "Benji's was being investigated by the Texas education agency for a number of things, including mismanagement in poor financial practices regarding state taxpayer funds". There was not an ongoing financial investigation it was an intentional abusive of authority to take over the school by TEA. Please see emails in exhibit D. In the court report Mrs. Prather and Ms. Robb made several defamed untrue and uninvestigated rumors about the school and Mrs. Robinson. Mrs. Prather facts were speculative because Channel 13 did not investigate the facts but created their own malicious story to tickle the viewer's ears.

Trumped up defamed statements was created and implemented by TEA (see Exhibit D). Channel 13 wanted a story about "a black charter school and money missing". Mrs. Prather also stated that "Theaola Robinson and Benji's staff were poor managers. Again this was never stated by TEA only by Channel 13 and Attorney Prather's. A certified staff of 100 for 629 children, staff, all bills paid timely, three meals daily for the children, security system insurance 6 busses, upkeep of the school, educational materials and supplies would cost more than 3. Million but the management at Benji's provided a top of the line modern technology programs for all age (prek-12th grades) and a well-designed and decorative school because of Theaola Robinson and the management staff at Benji's Academy. So please, how is it possible that the same amount is supposedly missing? That was our annual budget as stated in the court records. Apparently Channel 13 alluded and believe that an African American company cannot manage 3.million.

Yes! Benji's Special Educational Academy was responsible for educating hundreds of students with taxpayer funds (ten years of state funds) to operate the wonderful school for special need children. It's a fact that TEA never stated that 3. Million were missing because it would certainly be false, the proof and truth is reflected in the audits. Even the courts gave an illustration when Mrs. Prather tried to convince the courts that Theaola Robinson was not named in her poor management statement. Benji's Academy was "my baby" defamed and destroyed. See page 12 through 23 which give a real descriptive assumption of defamation.

Mrs. Prather stated "After years of looking into the school, and we have evidence attached to our motion going through all of this, and this will get to the question of substantial truth". Mrs. Prather stated "investigating the school for a number of years, receiving inadequate responses or no response, and after being **I think** documented in some instances-prevented from properly investigating the school, they finally appointed a new board of managers and superintendent to assist Benji's s with its financial woes." These are just words and Mrs. Prather's personal thinking but she said **"I think"**.

5

A so called board was appointed for one meeting. My question is what can be determined in one meeting especially when it come to the life of individuals and the educational process of special children or for children for that matter?

Mrs. Prather participation in this case is considered an unfair advantage which means unjust, and involves acts deemed unethical. Any attempt to acquire an advantage or to impose a disadvantage in a manner which violates such a standard of conduct is unfair. Exploiting my business, causing <u>business disparagement</u>, <u>my profession, and my character, my good name,</u> using my vulnerability for her personal, social objectives and using unethical methods to achieve and win her anti Slapp case. Mrs. Prather was a party in writing the Anti-Slapp law therefore, she can afford to play "tripping over and controlling the player" which deemed an unfair and unethical advantage.

**The** original case was filed 09/27/2010 in the federal courts with **KTRK Television, Inc was an interested Party.** Jury Demand: Plaintiff Nature of Suit: 446 Civil Rights: Americans with Disabilities Other Jurisdiction: Federal Question

A Government official or officer of the law violates the color of law statute by fabricating evidence against and destroying of an individual especially when that person's rights of due process and unreasonable seizure (mentally held captive) have been violated. In the case of deprivation of property, the official would violate the color of law statute by unlawfully obtaining or maintaining the property of another. In that case, the official has overstepped or misapplied his authority. All the above is true. The Fourteenth Amendment secures the right to due process and the Eighth Amendment also prohibits the use of cruel and unusual punishment.

The fourteenth amendment also provides: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**A person accused of a crime is to be allowed the opportunity to have a trial and not be subjected to punishment without having been afforded the opportunity of the legal process. I have not been given this opportunity.**
The public entrusts its law enforcement officials with protecting the community, respecting citizens and upholding the law not abuse of their power.

(a) A public servant acting under color of his office or employment commits an offense if:
- Intentionally subjects another to mistreatment,

6

- Falsification of information and misrepresentation
- Violation of Civil Rights
- Collusion
- Seizure and confiscation of personal properties
- Tortuous interference
- Business disparagement
- Dispossession of assessment,

All the above has been violated. Texas Education Agency agents knew their actions were unlawful; and intentionally by denying and impeding Benji's Academy and Theaola Robinson from exercising or enjoyment of their right, privilege, power, or immunity, knowing their conduct was unlawful; and deprivation of rights under color of law which include: 18 U.S. Code § 242. TEA intentionally premeditatedly plotted to shut down the great school, confiscate its properties and destroy the founder's name. Channel 13 seized the opportunity to make Theaola Robinson a target and example for the newly implemented Anti-Slapp Act.

In 2009 this was the progress of the school. **GREAT SCHOOL**

schoos     In 2009 Benji's Special Educational Academy along with other tops school was named as Top high schools in Texas:  High schools in each state that represent the qualities of a great school.
- <u>Debakey High School for Health Prof</u> Houston, TX.  Top Performing high school in
  Texas
- <u>KIPP Academy Middle</u>  Houston, TX. Top Performing high school in Texas
- <u>Benji's Special Educational Academy Charter School</u> Houston, TX A Most Improved High school in Texas.  Benji's Special Educational Academy shows the greatest improvement in test scores when comparing scores from the most recent year available to the year before.

TEA purposely placed $ 411,000 on warrant hold for the August 2010 reimbursements which was due on September 27, 2010 prohibiting the school from meeting its obligation. TEA used those obligations to create a financial upheaval in the school. If the reimbursements had not been withheld all the below obligations would have been met. Channel 13 again used third party hearsay to destroy us. Retirement contributions, $13,000 in health coverage, $43,000. IRS debt was a monthly draft through Wells Fargo Bank $87,000. Mrs. Prather made another false statement "The board of directors failed to oversee or adequately supervise the financial resources. And the charter holder failed to properly account for accrued unreimbursed leave as to liability. This is just a few of the problems that they encountered". None which is true and can be proven false

7

allegations. No one from Channel 13 investigated, interviewed nor spoke to any one from Benji's Academy. But deliberately pieced false information that defamed the school and Mrs. Robinson. *"Even the court understand and see there could not have been* $3 million missing in funds, as stated "this was just their basically operating budget".

As stated in the court report "There are no allegation made by any of the state authorities, federal authorities, and the pension plan, anything like that says that the $3 million was missing" But Mrs. Prather refuse to accept the truth.

I pray that Mrs. Prather will deal with facts and truth, not just to win an "Anti Slapp law whether it defamation or bring disgrace and injustice to someone's life.

Respectfully,
Theaola Robinson

# NOTARY

**STATE OF: TEXAS**          **COUNTY OF: HARRIS**

On _7 / 31/ 15_ , before me, Theaola Robinson

Personally appeared, before me and known as Theaola Robinson

Proved to me on the basis of satisfactory evidence to be the person

whose Name is subscribed to the within instrument and has hereby

acknowledged to me that she have executed the same in her authorized

capacity, and that by her signature on the instrument the person or the

entity upon behalf of which the person acted, executed the instrument.

**Signature of:** _[signature]_

**Date** _7-31-15_

**Witness my hand and official seal**

**Personalized Seal) Notary Public's Signature** _Rosa Smith_

_Rosa Smith_
**Print Name**

ROSA SMITH
Notary Public, State of Texas
My Commission Expires
April 16, 2017

# In the Court of Appeal for the

# First District of Texas

**THEAOLA ROBINSON,**

**Appellant**

**vs**

# THE WALT DISNEY COMPANY, ABC TELEVISION NETWORK, INC., CC TEXAS HOLDING COMPANY, INC., AND KTRK TELEVISION, INC.

**Appellees**

On appeal from the 234th Judicial District Court for Harris County,
Cause No.1154895, Honorable Mauricio Reece Rondon and Wesley Ward

## ORDER ON APPELLANT'S OBJECTION AND RESPONSE TO APPELLEES' MOTION TO DISMISS FOR LACK OF JURISDICTION AND VEXATIOUS LITIGANT

Respectfully submitted,

THE AOLA ROBINSON
5505 JENSEN DRIVE
HOUSTON, TEXAS 77028
PHONE: 832-250-4444
PRO SE

11

## ORDER ON APPELLANT'S OBJECTION AND RESPONSE TO APPELLEES' MOTION TO DISMISS FOR LACK OF JURISDICTION AND VEXATIOUS LITIGANT

On _____, the court considered Appellant's Robinson response to Appellees Motion to Dismiss this appeal. After considering the motion, the court decided that the request should be DENIED.

It is ORDERED that this case is retained on the appeal docket and is not to be dismissed.

**Sign Date:**_____.

_____ **[Name of judge]**

_____

**[Title of judge]**

# EXHIBIT B  COURT REPORT

*Court Report Motion to Dismiss*
*February 13, 2012*
REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. 2011-54895
THEOLA ROBINSON, IN THE DISTRICT COURT
Plaintiff
vs.
HARRIS COUNTY, TEXAS
THE WALT DISNEY COMPANY
CC TEXAS HOLDING CO.
INC., and, KTRK
TELEVISION, INC.,

Defendants
234TH JUDICIAL DISTRICT

**MOTION TO DISMISS**

On the 13th day of February, 2012, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable REECE RONDON, Judge Presiding, held in Houston, Harris County, Texas. Proceedings reported by computerized stenotype machine.

**APPEARANCES**

Berry Dunbar Bowen
SBOT NO. 02721050
Amy Brenda Archambault
SBOT NO. 24055110
BERRY DUNBAR BOWEN
3014 Brazos Street
Houston, Texas 77006-3418
Telephone: (713) 521-3525
Attorneys for Plaintiff
Laura Lee Prather
SBOT NO. 16234200
Catherine Lewis Robb
SBOT NO. 24007924
SEDGWICK, LLP
919 Congress Avenue, Suite 1250

Austin, Texas 78701
Telephone: (512) 481-8400
Attorneys for Defendant KTRK

VOLUME 1
**MOTION TO DISMISS**
February 13, 2012
PAGE VOL.

Motion to Dismiss ..............................4 1
Adjournment ................................52 1
Reporter's Certificate ......................53 1

(*Motion to dismiss at 2:27 p.m.*)

THE COURT: All right. We are here on Cause No. 2011-54895 *Robinson and Others versus the Walt Disney Company and Others.* Let me have counsel state their appearances for the record.

MR. BOWEN: Berry Bowen for the plaintiff. With me is Amy Archambault, also for the plaintiff Mrs. Robinson.

MS. ROBB: Katherine Robb for defendant KTRK Television and Ms. Laura Prather.

THE COURT: Okay. We have the defendant KTRK's motion to dismiss. I did some reading for this. We originally had this hearing set some time ago, but then weather got the best of all of us, and we ended up moving the hearing to until today.

The case is styled, Mr. Bowen, as *Mrs. Robinson and this Charter School versus the Walt Disney Company, ABC Television Network, Inc., CC Texas Holding Company, Inc., and KTR – KTRK Television, Inc.* Is the case being indeed prosecuted on behalf of Mrs. Robinson and the charter school?

MR. BOWEN: No longer, Your Honor. We filed an amended petition about conformance with the Court's order. We could not -- apparently one of our defendants had no legal existence. We couldn't get him served. And we were --

THE COURT: You mean one of your plaintiffs or defendants?

MR. BOWEN: One of the defendants was -- was not a legal entity. And at the same time when we filed the amended complaint, we did -- discontinued the suit in the name of the Benji's Special Education Academy. So, Mrs. Robinson individually is the sole plaintiff.

THE COURT: And then which are the defendants, then?

MR. BOWEN: The Walt Disney Company, I guess CC Texas Holding Company and KTRK Television, Inc. The other named defendant ABC Television Network, Inc., it was confirmed to us, was not a legal entity, and that's why we couldn't get service on them, and we're on the DWOP docket.

THE COURT: Okay. The -- the lawsuit essentially is not exclusively a defamation lawsuit.

MR. BOWEN: It's exclusively.

2

*THE COURT:* Okay.

*MR. BOWEN:* It's a pure defamation lawsuit.

*THE COURT:* I understand that KTRK was the entity that put forward the various. I think it was like two or three news stories around the similar events or the same events. It made a couple of reports, as did other media entities in and around the area, so I understand their liability.

Is there an alter ego theory or respondeat superior? I don't understand why Walt Disney Company -- and I don't know anything about CC Texas Holding Company, but I know a little bit about Walt Disney Company, so let me ask about Walt Disney first. How is Walt Disney liable in this case?

*MR. BOWEN:* They're liable under the express wording of Chapter 73 of the Texas Business and Commerce code. I had -- obviously, we're not here to argue that point today --

*THE COURT:* Right.

*MR. BOWEN:* -- since they're not the movant. But I have, and I can get it to the Court as quickly as necessary, communicated in the past with Ms. Prather and given her my detailed analysis of the historical analysis of the Statute, Chapter 73 of the Texas of Business of Commerce Code. Which is very interesting, because it was a model act promulgated by the broad industry and passed by a vast majority of the states in a very brief window of time from, I believe, 1947 to 1953 at the dawn of the television era, and has never been amended. And we believe that that analysis shows fairly clearly that there was some tradeoffs made by the broadcast industry, and that the owners subjected themselves to liability with certain defenses under the wording and intent of the model act.

*THE COURT:* So, there -- we're not going to -- we're not going to debate the liability.

*MR. BOWEN:* Right.

*THE COURT:* It's based on the statute --

*MR. BOWEN:* Yes, Your Honor.

*THE COURT:* -- in your opinion. Okay.

Is that the same thing for CC Texas Holding Company?

*MR. BOWEN:* Yes, Your Honor. I believe that they both qualify as owners under the law.

*THE COURT:* Okay. Whether they do or don't, we'll have that conversation some other day, perhaps. But at this point, I just wanted to understand that basis for it.

Okay. So, Texas civil of practice -let's try that again. Texas Civil and Practice Remedy Code Chapter 27 or known as the Anti-SLAPP, guess, provisions or Anti-SLAPP Statute, KTRK believes provides the defendant with certain remedies or certain defenses or a get-out-of-jail free card, if you will, or as Mr. Bowen probably would characterize it for certain types of reports, or certain types of litigation based on certain types of reports. So, Ms. Robb, are you going to argue the motion?

*MS. ROBB:* Yes.

3

*THE COURT:* Okay. Go ahead.

*MS. ROBB:* First is a preliminary matter, one, we did have some discussions with Mr. Bowen about that previously. We're not debating that today. But in fact we read the statute very differently, in fact I think just the opposite was the intent. The intent was to prevent exactly what's happening here, which is a indirect parent company being charged with and being held responsible for something that -- that an indirect subsidiary did.

And the idea was that you didn't want to have the say, in this instance, a television station being able to assert certain defenses and privileges and have the indirect parent company not avail -- not able to avail themselves of the same defenses.

And, so, we essentially sort of turned on its head his argument. We've had that discussion. We can have that another day. But the other issue relating to that is that we had filed special appearances, as I'm sure the Court is aware, for Walt Disney Company and for CC Texas Holding, because we don't believe the Court has jurisdiction over them.

*THE COURT:* Okay.

*MS. ROBB:* They're not a party to this

motion. But to the extent the Court would believe that it has jurisdiction, they would have the same argument. And if in fact the Court at some later date, you know what happened, we get to issue that we reserve our right to file an anti motion on their behalf as well.

*THE COURT:* Fair enough.

*MS. ROBB:* So, I just wanted to bring that up.

*THE COURT:* Okay. And on the merits of the motion itself.

*MS. ROBB:* Okay. Thank you, Your Honor.

As we've discussed, we are here on our motion to dismiss under the anti -- Texas Anti-SLAPP

Statute, which is codified at Texas Civil Practice

and Remedies Code 27.001. And I'm sure the Court --

I would like to briefly sort of go through, I guess, an Anti-SLAPP Statute generally, and then discuss how it applies to this case. And also give you a little background depending on, I guess, how much background you'd like. I can talk a little bit about the subject of the -- of the broadcast themselves or not.

First of all, the SLAPP Statute is a strategic lawsuit against public participation. And these are lawsuits that are without merit, directed at someone who speaks out on a matter of public concern. It's generally designed to punish those who speak out, to intimidate speakers, to inhibit the press or the public's right of free speech, to chill free speech and debate rather than genuinely seek recovery for injuries due to defamation. That's why Texas is one of 28 jurisdictions that has now passed an Anti-SLAPP law. There is legislation pending in at least two other jurisdictions and also the U.S. Congress. And to the extent the Court would have questions about the Anti-SLAPP law or other legislation, my colleague Ms. Prather is the has more information. So if we get there, she would be happy to, I believe, to address that.

4

At this point, though, I want to discuss just a little bit, because the plaintiff has made -- plaintiff hasn't really -- we're going to go through the actual Texas statute in a minute. But the plaintiff hasn't really made an argument that it doesn't apply in this instance. What the plaintiff has done is attack Anti-SLAPP statutes generally, and sort of raise this argument that: Well, it's not really meant to protect media defendants. It's supposed to protect, sort of, the impecunious; the, you know, the would-be proverbial little guy. That's certainly one of the parties it's meant to protect. That's not the only party it's meant to protect. And we would contend that the media is often the one that is out raising issues of public concern, educating the public, telling the public

that how their public servants are working, how their public money is being spent, advising them with issues that matter to them. So in fact the media is -- is certainly a necessary beneficiary of this -- of this law. But not lie to create a story but at the same time destroy lives.

*THE COURT:* But it still does not strip the media of their obligations or liabilities, if you would, under standard defamation law.

*MS. ROBB:* No. I mean, the defamation statute to the extent when there's a lawsuit like this, where - and we'll go through the statute itself - where the media is clearly speaking out at an issue of public concern, there is a heightened standard for the plaintiff to meet -- to overcome that burden to -- to sustain the motion to dismiss.

Give you a little bit of background first on the school itself, as Mr. Bowen said. The plaintiffs originally were two plaintiffs. It was Benji's Special Education Academy and Ms. Robinson.

The plaintiff is now just Ms. Robinson. She was the superintendent of Benji's Special Education Academy.

She was also on the board of the charter holder and of the charter school itself. And both are sort of referred to as Benji's. She is the sole plaintiff that's remaining in the case today. At the time of the broadcast at issue, and we're going to go through the broadcast in a minute. Benji's was being investigated by the Texas education agency for a number of things, including mismanagement in poor financial practices regarding state taxpayer funds. At that time Benji's had been taken over by the TEA, who had ordered the school's closure; immediate closure, in fact, once they took over and discovered that the school literally had no money. They also eventually revoked the schools charter.

Benji's was a school that was responsible for educating hundreds of students and received over 3.3 or over $3 million in taxpayer funds in the previous year. Mrs. Prather stated "After years of looking into the school, and we have evidence attached to our motion going through all of this, and this will get to the question of substantial truth. I'm not going to into that detail today, unless the Court would like us to. But after investigating the school for a number of years, receiving inadequate responses or no response, and after being - I think documented in some instances - prevented from properly investigating the school, they

5

finally appointed a new board of managers and superintendent to assist Benji's s with its financial woes.

I would direct you just to two, I believe, pieces of evidence that sort of layout some of the -- their financial woes. First of all, Exhibit B to our motion, which is a September 3rd 2010 letter from commissioner of education Robert Scott do members of the charter holder board.

There's also a SOAH. And we attached the proposal for determination to our motion. Since that time, the proposal has actually been accepted by the commissioner, and it's now the final decision. We attached that to our reply. It's essentially the same thing with just a letter at the front that says, basically: After reviewing this with --

*THE COURT:* Right.

*MS. ROBB:* -- this minor change, we accept this. Again, if you look at that, and specifically at Pages 54 through 55 and findings 55 through 68, you'll see that among other things the charter holder was subject -- the subject of a warrant hold for nonpayment to the teachers retirement system in the of amount of $43,000 and for retirement contributions, and $13,000 in health coverage. The Department of Agricultural cancelled the charter holder's participation in child nutrition programs, because the charter holder's failure to demonstrate physical responsibility. The charter holder owed the IRS a debt of $87,000 unpaid taxes. The board of directors failed to oversee or adequately supervise the financial resources. And the charter holder failed to properly account for accrued unreimbursed leave as to liability. This is just a few of the problems that they encountered.

Because of this, and once -- once the TEA started really looking into this, took over the school, KTRK and a number of other media entities reported on this, educating the public about this matter of public concern. One, talking about educating school children in its community; two, you're talking about $3 million of taxpayer funds.

So, they clearly reported on what we believe is an issue of public concern community.

*THE COURT:* The $3 million in funds, though, is just their -- basically their operating budget.

*MS. ROBB:* I'm sorry.

*THE COURT:* The $3 million in funds is basically their operating budget.

*MS. ROBB:* That was just for one year.

*THE COURT:* Right. That's not -- there is any allegation by the -- any of the state authorities, federal authorities, the pension plan, anything like that that says that the $3 million was stolen?

*MS. ROBB:* No. And we never said that it was stolen. And that's what we're going to get into in a minute.

*THE COURT:* All right.

6

*MS. ROBB:* That's actually a critical element in this case, Your Honor.

*THE COURT:* I agree.

*MS. ROBB:* So, anyway for reporting on these issues of public concern, KTRK was sued. So, just a little background on that.

*THE COURT:* And they're the only one that was sued despite the reports the others made.

*MS. ROBB:* That is correct, Your Honor. That is correct. The number of -- and in fact plaintiff attached a number of the other – or transcripts of the other broadcast or the articles themselves to -- to their petition. We attached some to our answer. Clearly, a number of media entities were reporting on this. We were the only one that's been sued.

So, getting back to Anti-SLAPP Statute. First of all, as I said, the plaintiff hasn't argued that by the wording of this statute it doesn't apply to this instance or to KTRK. They've made this sort of general allegation that perhaps Anti-SLAPP Statutes are disfavored. They attached the California Statute, which is the preeminent statute in the country.

*THE COURT:* Yeah. I take it that this -- this statute applies to this situation.

*MS. ROBB:* Okay. And we've -- we've briefed that. I won't go -- sounds like the Court would like me to move on, so I won't go through that, but we have briefed. If you look at the *Freedman* case, it actually goes on to talk about how the California Statute has been expanded since it was first passed. And in fact has a citation discussing how it -- how it applies to media defendants. And in fact we attached some -- or we cited to some cases in our reply. So, clearly, the Anti-SLAPP Statutes apply to media.

In fact, in this instance, in Texas it's a fairly new statute. It's actually been, as far as we know, three orders have been granted so far granting Anti-SLAPP motions; two actually here in Harris County, and one elsewhere in Texas. Two of those were attached to our motion as Exhibits R and S. And we attached the most recent one to our reply as Exhibit B. I have a copy here, if the Court would like it.

*THE COURT:* I'm okay. I'm fine. If it's in the -- if it's in the file I don't need another one.

*MS. ROBB:* It's in the reply. Okay.

The defendants in those cases, in one case the defendant was a Dallas BBB. In another instance, the most recent one, the defendant was the Houston Community College system. And in the third, the defendant was actually media entities: KPRC, KHOU and the Houston Chronicle. And in that instance that's the ***Vieira versus Jordan*** case, which is somewhat similar based on investigative report.

In that case the Harris County Court granted the media defendant's motion to dismiss. Even though the defendants had misidentified, or identified plaintiffs as suspects in a criminal investigation. Although it was later determined that the plaintiffs were not involved in the crimes. So, we think it clearly applies to media defendants. It clearly applies to this case.

I would like to just go briefly through the Texas Anti-SLAPP Statutes, so we

7

understand what we are required to do and what plaintiffs are required to do at this point. And I have similar -- I have copies where I've highlighted.

We would offer them, if I may approach?

*THE COURT:* Sure. Thank you.

*MS. ROBB:* So in short, the statute says that: The lawsuit arises out of a party's exercise of its right to free speech. The claim is subject to motion to dismiss which must be granted, unless plaintiff can establish clear and specific evidence of a prima facie case for each element it claims. And we'll go through those in a little bit.

But the first step is that the court engages in the analysis determining whether the statute actually applies. And, again, the wording in the statute if you look at Texas Civil Practice and Remedies Code 27.003A, it says: The lawsuit is based on, relates to, or is in response to a party's exercise of the right of free speech, the right to petition, or right of association the statute applies. The exercise in the right of free speech is also defined in the statute. It's defined as communication made in connection with a matter of public concern. And if you look at the statute, that's 27.001.3.

So the next step, assuming that the statute applies, and again we would contend that it does: The plaintiff must demonstrate by clear and specific evidence a prima facie case for each element of his or her claim. This means evidence should be sufficient to defeat a motion for summary judgment.

And I refer the Court to *In Re Does* case which we cited in our motion, and it's Tab 9 in your notebook. And in that instance, that was actually a slightly different case.

In that instance, the Court required a defamation plaintiff to establish a prima facie case for each essential element of the claim. In that instance, he was trying to obtain a identity of an anonymous defendant. The Court essentially said that it was necessary for the plaintiff first to support his defamation claim with facts sufficient to defeat a motion for summary judgment.

The next question is clear and specific. And clear and specific standards is a heightened standard. It's greater than just a preponderance of the evidence. And that's taken from case law interpreting the reporter's privilege. And I would direct you to *Channel 2 television versus Dickerson* and that's Tab 12 in your notebook. Also, *Texas Disposal System*, a copy of that case for the Court and for Mr. Bowen. Here you go, Mr. Bowen. I apologize. I promise I won't bring to you more things.

*THE COURT:* That's fine. Thank you.

*MS. ROBB:* In the *Texas Disposal* case, Court says: Evidence is clear and convincing if it supports a firm conviction on behalf of the trier of fact that the fact to be proved is true. So once again, once the defendant establishes the Anti-SLAPP Statutes applies to plaintiff's complaint, the burden shifted to the plaintiff. And dismissal must be granted unless the plaintiffs can meet this very heavy

8

burden establishing a prima facie case for each essential element of the claim under the heightened standard of

clear and specific. If the plaintiff cannot demonstrate by clear and specific evidence every element of the claim, the Court must grant the motion to dismiss. And, furthermore, under the statute, and I would refer you to 27.009A1 and A2, under the statute if the defendant prevails, they're entitled to and, in fact, the Court must award attorney's fees and sanctions. Getting into the specifics of this case, again, as I said despite these general attacks on the Anti-SLAPP Statutes, it's clear that it applies -- the plaintiff hasn't actually contended that it doesn't apply. There's clearly nothing in the statute that says you can't be a media defendant.

You have to be a little guy. It's -- it's based on:

Are you speaking out on a matter of public concern?

We think very clearly these reports did concern matters of public concern. Again, they can turn the TEA's investigation into financial mismanagement of Benji's. The difficulty in accounting for state funds --

THE COURT: If I deny the motion to dismiss, it's not because I think the statute doesn't apply or that these types of statements don't fall under the statute.

MS. ROBB: I apologize.

THE COURT: I said if I deny the motion to dismiss, it's not going to be because I think these types of stations are not public interest or that the statute doesn't apply, et cetera.

MS. ROBB: Okay. Thank you, Your Honor. I'll move on.

So, I want to -- as I said at this point, the burden is on the plaintiff. We've met our burden. Our burden is simply to demonstrate to the Court that the statute applies. The plaintiff now has to prove prima facie case of each element with clear and convincing evidence. Burden is on the plaintiff.

I do want to go into two issues, just because we think they're so clear from the pleadings themselves that the plaintiff can't demonstrate them.

First of all, in order to prevail in a liable claim against a media defendant in Texas, the plaintiff has the burden of establishing the defendant published a non-privileged statement that was defamatory, that's important; as to plaintiff, that's important, with actual malice regarding the truth of the statement.

And in this instance, we would contend there are two reasons why plaintiff will have to show actual malice. One is because we believe she's a public figure, or limited purpose public figure. And, two, even if the Court doesn't find that, because there are a number of constitutional statutory privileges that apply, and the Court will have to -- pardon me, the plaintiff will have to demonstrate actual malice to overcome privileges.

At this point, I just want to talk about two of those, though. And those are that the defendant published a statement that concerned plaintiff and that was defamatory. Our burden is simply to demonstrate to the Court that the statute applies. The plaintiff has brought a claim

for liable, per say. That means that the statement is so obviously hurtful that it requires no proof of injury, and it essentially falls within one of four categories of speech.

And I'm quoting from, again, the case I just gave you, the *Texas Disposal System Landfill, Inc.* A false statement will typically be classified

as defamatory, per say, if it injures a person in his office, profession or occupation, charges a person with a commission of a crime, imputes sexual misconduct or accuses one of having a loath-some disease. Now, the only one that's applicable here is the -- and the only one that, in fact, plaintiff has alleged is the -- charges a person with a commission of a crime. So, we'll get into that in a minute.

The first element they'll have show, though, is that the statements were of and concerning, they were about plaintiff. And, again, I refer you to the *Huckabee versus Time Warner Entertainment* case and the *Newspaper Inc. versus Matthews*. Those are at Tabs 27 and 41. There is to be a cause of action for defamation. This is just at the very sole of the cause of action. The allegedly defamatory statement must concern the plaintiff. It must be of and concerning the plaintiff. In the instance case, the plaintiff is not even named in the complaints of statement, not even mentioned in the complaints of statement.

And I just want to go through those to demonstrate that to the Court. In fact, the plaintiff is barely even mentioned in the broadcast. And to the extent she is, in one instance, it's actually laudatory mentioned, someone saying something nice about her. I have the brought here. And because they're a little hard to read, I went through and just -- I have the little piece of paper on the front with the complained-of statements --

*THE COURT:* Okay.

*MS. ROBB:* -- that we can look at.

One for you.

These are actually the exhibits from plaintiff's petition. It's highlighted. So if we go through the complained-of statements, the first one is for -- from the September 15th, 2010, broadcast. And the complained-of statement is: According to the State, millions in taxpayer dollars cannot be account for. No mention of Ms. Robinson. And the state disclosure is based on a lack of sufficient financial records, meaning state doesn't know where the over $3 million of taxpayer money given last year has been spent. Again, no mention of Ms. Robinson. That's Exhibit 2 to plaintiff's amended complaint. Exhibit 3 has the complained-of statements are essentially the same, a little bit different. For the State the issue is simple: Where is the money? They say millions of taxpayer dollars are unaccounted for. The state closure is based on a lack of sufficient financial records, meaning, the State doesn't know where the more than $3 million of taxpayer money given last year has been spent.

Again, there's absolutely no mention of Ms. Robinson in those complained-of statements. That was Exhibit 3.

Going to Exhibit 6. This is the story published on defendant's website on September 25th.

10

The complained-of statement: Where is taxpayer money going? And how is taxpayer owning buildings being used? The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money.

In a lease agreement obtained by eyewitness news raises new questions. Again, no mention of Ms. Robinson. There is mention of Benji's. Benji's is no longer a plaintiff in this case, even if this was otherwise sufficient. Similarly, the Exhibit 8, which is the September 27th article: The Texas Education Agency doesn't know how the academy spent $3 million of state money. Again, no mention of Ms. Robinson, only a mention of the academy.

Let me get to Exhibit 9, which is the September 30th article. Complained-of statement it is: The State says it has no choice, alleging Benji's did not provide proper financial records to account for over $3 million of state funding the past year. Again, no mention of Ms. Robinson.

Finally, the October 11th article, and that is Exhibit 10: On September 14th, the TEA ordered Benji's Academy to close citing millions of dollars in state funding that was not accounted for; again, no mention of Ms. Robinson.

So, we would contend that on this very fundamental issue, there is no way that plaintiffs can - can demonstrate that the statement is of and concerning Ms. Robinson. There's no mention of her at all. In fact, if you look at the broadcast themselves, there's hardly a mention of her in any broadcast at all. In two of the broadcasts, she's not even mentioned. Her name is never mentioned. In two of the broadcasts she's mentioned only in reference to a statement. Let me read it to the Court. Let me see, right here. And it says it's from a student. This is a -- hardly a defamatory statement, it says:

Ms. Robinson -- Ms. Robinson, she sit down and talk to you, other schools would just suspend you. That's the only reference to her even in the broadcast.

THE COURT: What was her role at the school?

MS. ROBB: Pardon me?

THE COURT: What was her role at the school?

MS. ROBB: She was the superintendent.

THE COURT: The head of it.

MS. ROBB: The head of the school.

THE COURT: How many other administrative employees did the school have?

MS. ROBB: That, I don't know. I believe Mr. Bowen could probably answer that. There was a school board that had a number of members and, then, also a charter holder board that had a few members, and she was a member of both of those as well.

THE COURT: Okay.

MS. ROBB: I don't know how many administrators. I believe the school had about, I believe it went up and down but had about, I think, around 160 at the time of the closing.

THE COURT: Okay.

MS. ROBB: Students, that is.

So, anyway, as I said it's our contention that she's not even mentioned in the

11

*MS. ROBB:* We view those slightly differently --

*THE COURT:* Which of --

*MS. ROBB:* -- but at the end of the day --

*THE COURT:* Which of those would you rather have published in the Texas Lawyer? One of them has to be published in the Texas Lawyer, which would you rather have published?

*MS. ROBB:* I'd rather not have either of them.

*THE COURT:* One of them has to be, in my hypothetical --

*MS. ROBB:* 'Um --

*THE COURT:* -- that you're a sloppy a record keeper, or that you have no earthly idea where any of your client trust funds monies are?

*MS. ROBB:* Well, I --

*THE COURT:* You've got to answer my question, Ms. Robb. You've got to answer my question

before you say anything else.

*MS. ROBB:* Okay. 'Um, I mean, I would think I would likely -- I probably would prefer the first.

*THE COURT:* I agree on both counts, that you would probably prefer the first, and that you would have lost your credibility had you said otherwise.

*MS. ROBB:* Thank you. I mean, I think, you know, I had to concede that.

That does not mean that this statement is defamatory, per say, though. It doesn't mean that necessarily that that statement would be. Again, we're talking about the commission of a crime. We're talking about how the average person would perceive this. 'Um -- and, again, Ms. Robinson's interpretation of these is immaterial for purposes of the defamation claim, especially --*THE COURT:* So under --

*MS. ROBB:* -- about when we're talking about --

*THE COURT:* -- the reasonable person standard or the person on the street standard, it is your position that rather than being accused of a sloppy record keeper, that someone sees in the Texas Lawyer that you have no earthly idea where any of your client trust fund monies are, that the average person on the street wouldn't perceive that as criminal?

*MS. ROBB:* I don't think that's what we said about what -- we certainly didn't say it about Ms. Robinson. I don't believe that's what was said about the -- about Benji's s, even. And one thing is you have to look --

*THE COURT:* The State doesn't know where the over $3 million given to the taxpayer -- of the taxpayer dollars were spent -- how they've been spent.

*MS. ROBB:* Yeah.

*MS. PRATHER:* Your Honor --

*MS. ROBB:* That is true. That's what -- that's -- that's a true statement. Defendant had or, excuse me, plaintiff has the burden of demonstrating substantial falsity. The gist of the statement is true. The statement is substantially true.

complained-of statements, and barely mentioned in the broadcast. The two that do also mention – or mention her in relation to a lease issue, which is another issue that's not subject to this and, again, certainly doesn't accuse her of a crime. So, the second issue here that we want to just discuss briefly is, is the plaintiff has brought a claim for liable per say. So, again, this is something that's so obviously hurtful that it requires no proof of injury. And to be liable per say -- first of all, to prove that this is defamatory liable, per say, first of all, it has to be substantially false. It has to be defamatory. And because she's alleged liable, per say, and has alleged sort of the four options, the crime option, it has to also charge her with a commission of a crime.

And, again, I don't want to take up to much time and go through each one of those statements with the Court. But it's clear that not only do the statements not mention her, they certainly don't accuse her of a crime -- of a crime. There's nothing intrinsically defamatory about defendant's statements that the State of Texas believed that Benji's was mismanaging state funds and wanted to know how the money that it gave Benji's was used. The plaintiff has alleged that she's established a prime facial case of liable, per say, because she asserts that defendant's insinuated that she embezzled over 3 million and implied criminal behavior. Again, we would contend, if you look at the complained-of statements, they never say:

Embezzled. They never say: Misappropriated. They never mention or imply any sort of criminal behavior. They just didn't -- simply didn't accuse her of a crime.

*THE COURT:* Let me ask you this, Ms.

Robb, if I said that Sedgwick, well, your law firm, you yourself --

*MS. ROBB:* Uh-huh.

*THE COURT:* -- not your law firm, but you yourself, you weren't a very good record keeper. You're a sloppy record-keeper. Or if I said: Ms. Robb has no idea, she can't tell us where any of her client's trust fund money is. Is there a difference in those two statements, legally?

*MS. ROBB:* Is there a difference legally this those two statements? The statements are: She's a poor manager of funds, and I apologize --

*THE COURT:* A poor record keeper.

*MS. ROBB:* A poor record keeper.

*THE COURT:* And the other is: Ms.

Robb has no idea where any of the money that her clients put in her trust fund account is.

*MS. ROBB:* I mean, there's certainly, a difference in the words of those statements. I don't think either of those accuse you of a crime, certainly not -- again, in this instance it's defamatory, per say. So, it has to accuse you of a crime. You can't look at implications. You can't look at -- you certainly can't look at -- and this has nothing to do with it being, per say, this just has to be with defamation laws, strict defamation law. It doesn't matter if the interpretation that the plaintiff has, it's the interpretation of a reasonable average person.

*THE COURT:* Which it owes --

And that's exactly -- again, you have to also look at the full context talking about how the state wasn't getting proper documentation for these.

THE COURT: What were you going to say Ms. Prather?

MS. PRATHER: Well, I was just going to say your hypothetical is as to -- as to Ms. Robb or Ms. Robinson what the broadcast talked about was a third party.

THE COURT: The school.

MS. PRATHER: The state.

THE COURT: That's right.

MS. PRATHER: The state didn't know where the money was. And there were years of mismanagement from 2005 on and financial improper record keeping that the State could not figure out the money. So, you're looking at a third party.

It would be almost as though the IOLTA account holder. The bank says: We don't know where the money is. That would be a similar scenario, because you're talking about the third party state not knowing. That's what KTRK recorded was the State not knowing where the money is and the years, more than six years of financial mismanagement and lack of accountability.

THE COURT: We only have 30 more minutes before another hearing comes in. So, I need to give --

MS. PRATHER: Okay.

THE COURT: -- the plaintiff a chance to respond. So -- and if we're going to have any back and forth some more, you need to wrap up your comments soon.

MS. ROBB: Absolutely. Thank you, Your Honor. I'm -- that's about all I can just essentially. Again, we believe that at this point the burden is on the plaintiff. The plaintiff has to demonstrate each element by clear and convincing evidence. It has to make a prima facie case. We're happy to, if the Court would like us to, later on address the other elements. I only brought those up to at this point, because I think those two are pretty clear just from looking at the pleadings. Again, we would ask that you grant our motion and award us attorney's fees and sanctions. Thank you.

THE COURT: Mr. Bowen, are you going to respond or Ms. Archambault?

MR. BOWEN: Your Honor, I will respond.

THE COURT: Go ahead.

MR. BOWEN: Your Honor, the question of whether or not the publication was directed to Mrs. Robinson, even though her name was not mentioned, the law of Texas since, at least the *Newspaper Inc. versus Matthews* case, is that the person who's defamed does not need to be named in the article.

THE COURT: If they are capable of being identified --

MR. BOWEN: If.

THE COURT: -- under the circumstances.

MR. BOWEN: If -- if it's -- whether

14

it's written -- it's not necessary for the plaintiff to prove that the intended -- to the plaintiff it's -- is the recipient understands that's who it was directed to. Ms. Robinson's affidavit is of record. Your Honor asked about her involvement with this school. Ms. Robinson formed this school in 1981, 17 years before it became an open enrollment charter school, fifteen years before we even had a law permitting open enrollment charter schools. Ms. Robinson was Benji's Academy. And I submit, and I stated this in my pleadings and in my argument, I believe, that these standards for determining, for a Court to determine whether or not it would reasonably directed to a particular person were evolved. The -- the *Newspapers* case is a 1960 decision of the Texas Supreme Court.

We have this tremendous resource now called the Internet. And much of my **proof is based on the feedback of the recipients, the general public to whom the** -- were the recipient of these news reports. And those, I believe, establish the prima facie proof when they write in their responses:

Throw this person in jail, not because she's black because, she's a thief. She needs to be at the cross bar hotel; Ms. Robinson, Ms. Robinson, Ms. Robinson.

The record before Your Honor is replete with these types of statements from the general public, from the recipients to whom this was directed. The other point I will make is this statement of the -- this -- this handout she just gave me, which I really like, that really puts these statements in isolation. And I will submit to Your Honor that there is nothing in the record anywhere

where -- where the defendant's claim that the State of Texas ever told them that over $3 million of taxpayer money is missing. They're not reporting that.

Exhibit V to their motion to dismiss is the only statement in the record of the State of Texas, of the state education agency. The press release that they released on the 14th of September 2010, and that is the statement that became the subject of the reporting of all the other news agencies, as we've talked about, and of this new agency that we've talked about.

That statement simply says that: Oh, well, this school is being closed because it's no longer financially viable, period. That was what was reported by the other news agency. As hard as it is for me to believe, but the record is what demonstrates it now, is that all of this about the state not knowing where $3 million in taxpayers funds was spent over the last year is made up by these people; completely made up.

And, furthermore, to get back to the beginning, there was no investigation going on. This school was under complete control of the state. They controlled the bank accounts. They had all the financial records. Annual audits had been filed and reported. They're trying to pick and -- and -- and grasp little things that in -- in the year 2005, they -- they stopped getting their free lunch

programs because they didn't fill the forms out right. I would submit to Your Honor, mismanagement and misappropriation are not on a continuum. They're not matters of a degree. These are qualitatively different the matters.

The statute states that one of its purposes is that meritorious claims are to be

protected. And it also states that it does not change the law at all. The law of defamation is to survive this intact. If we are out there trying to quell public discussion, stop the news media, stop anything, then we deserve to be slapped by the Anti-SLAPP law or whatever it is.

But the law specifically says that its purpose is to encourage and safeguard the

Constitutional Rights of person to petition, speak freely, associate freely, or otherwise participate in government to the maximum extent permitted by law.

And at the same time protect the rights of a person to file meritorious lawsuits for demonstrable injury.

That is where we are. Yes, we have a burden to put on a prima facie case that they --there's no disagreement about the publication.

There's no disagreement about the contents of this statement. Have we proved prima facie that it was defamatory? Yes. Because the intended recipient, entire context test demonstrates, and I submit again, Your Honor, that we're in the year 2012, and we have this Internet that guides the Court and helps the Court, and that we got the feedback from the public.

We don't have to look at the statements and determine whether this could, in fact, have happened. Whether we're reaching to tell you that this could be the import, or the meaning, or the way it was perceived. We have it in the record that person after person is saying: Throw her in jail.

She is a thief, Mrs. Robinson personally. We have carried our burden of bringing a prima facie case on that point. Just because this law, that's so broadly worded and so vague has been passed, it doesn't mean that we have a new era of irresponsibility of the press. We never tried to quell anything as a matter of public discussion here. All the news media reported this.

We have contrasted responsible reporting without an out-and-out defamation, per say, that is not based on anything that the State of Texas said that is grossly irresponsible. And it has been devastatingly damaging to a woman that was laboring the poorest ghetto of the city for 30 years to try to help special children. Not only was her baby, this school, taken away from her summarily, which is not the subject of a Civil Rights action in Federal Court along with this administrative procedure, that they tried to somehow bring into the issue of whether or not we've stated a prima facie case. But --

*THE COURT:* If this school were in the heart of River Oaks or the Memorial Villages serving only affluent kids, would it make any difference to the analysis?

*MR. BOWEN:* Absolutely not.

Absolutely not.

Anyway, Your Honor, I submit that we have carried our burden. I submit that we – I submit that they can't have it both ways. And a very interesting case that lends some support to that proposition, although I'll quite frankly confess that

I'm not sure I completely understand it, but it's a case following *Newspapers versus Matthews*, and that's *Allied Marketing Group versus Paramount Pictures Corporation* at 111 S.W. 3d 168. And I have a copy for the Court to add to this as well.

But, again, that's another case in which the plaintiff was not identified specifically by name in the defamatory article. And the question is raised: How can you be a public figure if you're not even named in the article? So, I don't believe we're a public figure. But I do believe that even if the public figure test applies, as I've set forth in my memorandum, the statement of the United States

Supreme Court on that is very clear. Even in a defamation of a public official, the defendant will not be likely to prevail where the publisher's allegation are so inherently probable — improbable that only a reckless man would have put them in circulation.

This school was running since 1998 with a $3 million annual budget. There were 40 staff and teachers teaching these schools every day. Buses were running. Meals were being served. Coaches were teaching physical education, band, teams, I'm sorry to say that the entire $3.3 million is unaccounted for is grossly irresponsible and completely improbable. I have met my burden. Mrs. Robinson has met he burden under the stat -- Anti-SLAPP law, and

this action should be allowed to proceed. Thank you.

THE COURT: Last word.

MS. PRATHER: Yes, Your Honor. Just a few different things here.

To give you a little more background of the -- of the case. This is the third time that KTRK, that -- that the defendants in this case have faced a lawsuit from Ms. Robinson over these same broadcasts. So, you know, they originally sued Disney in Federal Court. We told them: You've got the wrong entity. We gave them a bunch of cases and orders showing that Disney -- there is a jurisdiction over Disney in this instance. Exactly the opposite is the argument that they're trying to make, and have no case to support for jurisdiction over Disney.

Then they tried to bring them into the TEA, case and the judge wouldn't allow them to grant leave to bring them into that case. So, this is now the third time that we've had to defend against these -- this sort of -- this lawsuit from the same plaintiff. The real beef here is against the TEA. The TEA shut down her school. It's not against us. And the -- the statements that were made by the viewers, they have coalesced all of those statements into one place.

But the statements made by the viewers of the KHOU broadcast, and the statements made by the viewers of the KRIB broadcast - I mean, there are similar defendants in this lawsuit - were the same or similar to the statements made by those who watched the KTRK broadcast. So, if those two broadcasts were not something that liable is made of, how come those recipients and viewers came to the similar conclusions? We've established the test here. The test is: Was this to protect activity? Yes, it's protective activity because it's a matter of public concern that discussed. It falls within the definition under 27.007 or,

excuse me, 001 sub 7. Clear and specific, we haven't discussed a whole lot, but that's a heightened standard. They have to be able to establish material falsity. The documents that are attached to the pleadings, and specifically the SOAH findings show very clearly that financial is management, lack of failure or failure to pay IRS loans, failure to pay loans that required hot lunches to continue, failure to pay teacher retirement system, all of those things were reoccurring problems for this school. And the record is replete with documentation showing and exemplifying exactly the basis for the statements made in the KTRK broadcast.

I don't want to get hung up on the "of and" concerning issue, but the case of *Cox versus Penick*, which is behind Tab 14. This is a case about the Bastrop County DA. And the article at issue was discussing the prosecution's case being based on false premise. The Court held that that was not sufficiently of and concerning Mr. Penick, the DA, in Bastrop County. Even though he might be identified with the DA's office, since he is the DA, it was still not sufficiently of and concerning him as mentioned in the article. The test that you look at when you're determining substantial truth or material falsity, which is their burden, is you look at the entire context of the broadcast. If you look at the entire context of the broadcast, it's very clear they're talking about: The State is really upset, because we can't find the money. We have gave them a bunch of money. We can't find the money. This is a reoccurring probable. That is substantially true.

She, Ms. Robinson, has not denied the substantial truth of that statement. She -- in fact, she has admitted to the substantial truth of those statements, that there was repeated financial mismanagement. Her issue is with the amount. And we've cited in our reply a litany of cases that talk about the fact of the gist of the statement being correct. The amount makes no difference. It's the gist of the statement, which is the money couldn't be accounted for. It was financially mismanaged. The amount doesn't matter. And that's really what her complaint is. Her complaint is they shut down her school.

THE COURT: What if there was a difference between the gist and the amount in the order of magnitude of 10,000?

MS. PRATHER: In the order of 10,000, Texas Courts have already said that's okay.

THE COURT: So a 10,000-times difference is no concern?

MS. PRATHER: I don't know about 10,000 times. But we have the *Rogers versus Dallas Morning News* case. We have the *Dolcefino* case. We have a litany cases that are cited in our reply that address very specifically the fact that substantial truth inaccuracies as to an amount --

THE COURT: Those cases were three and four times, though --

MS. PRATHER: 'Um.

THE COURT: -- the amount, correct?

MS. PRATHER: You know, I don't -- I

18

believe some are more than that, Your Honor. I believe some were substantially more. 43 percent of its donation, if you look at the *Rogers versus Dallas Morning Case*, it said that the newspaper's inaccurate statement that a charity only spent 10 percent of its donations on actual services when, in fact, they spent 43 percent.

THE COURT: That's four times.

MS. PRATHER: Okay. You're better and quicker at math than I.

THE COURT: It's that accounting degree I've got.

MS. PRATHER: But there's -- you know, there are -- there are a bunch of other cases as well.

The fact of the matter is nobody that TEA gave examples of money that was missing. Lots of examples of money that was missing, and lots of examples that -- that -- that consisted of a total sum that was significant.

THE COURT: That was the 43,000, the 13,000, the 87,000.

MS. PRATHER: 250,000 default judgment against the school, 87,000 taxes to the IRS; inadequate disclosures of federal funding expenditures, who knows how much that is; unpaid retirement contribution and health coverage premiums; the Texas retirement system, don't know how much that was. The school in general being treated as a high risk grantee, and more and more and more. And this was something that was going on for six years.

So you focus on, you know, a particular year is not focusing on the entire context. The entire context is a history of improper record keeping and money unaccounted for since 2005. So I think -- I think we're getting outside the entire context by trying to narrow in the way that -- that's being suggested.

'Um, the public figure test, Your Honor, as well, there -- well, let me finish with substantial truth. The substantial truth, they've not established material falsity, in fact, they've conceded to the substantial truth, the fact that it was mismanaged the school, had financial mismanagement problems. This is also a report on allegations being made by TEA. And Texas has a long line of cases that deal with when a media defendant reports on a third party allegation, they don't have to prove that the underlying allegation was true. That's for them to fight about in their TEA lawsuit. All we have to do is say: We reported on the allegation being made. We accurately reported the allegation, which we did. And we met the substantial truth test by doing so. It's interesting and worth noting that even within these broadcasts, there's a statement that was made that says, from one of the members of the board, that says: We don't know no of any fraud or misuse of funds specifically absolving Ms. Robinson of any guilt, if any guilt were implied. That was included in the broadcast. If you look beyond substantial truth, which we don't think that you need to, but if you do, then you still get to the privileges, the privileges that are contained in Chapter 73 of the Texas Civil

Practice and Remedies Code that talk about fair report and fair comment. And we have established that this was a fair comment on a matter of public concern, and that there were

19

reports on governmental proceedings. Both of those are protected under Chapter 73. And in order to overcome those, you have to establish actual malice. It does not appear that based on Ms. Robinson's papers that there is any evidence to overcome the state of mind of the defendant, excuse me, of the defendants that have been attached to our affidavits.

And the third issue, of course, is they ultimately have to establish actual malice, because Ms. Robinson as is limited purpose public figure. This is about a matter of public concern.

She's a limited purpose public figure because she pressed herself into the vortex of this controversy.

This is apparent by her defiance of the TEA order to close the school among other things. Your Honor, if you have any questions, I'm happy to answer them. We -- obviously, they're very upset by what the respondents -- or the viewers said. We aren't responsible for what the viewers said. They're upset about that. That's not competent evidence in this instance. Ms. Robinson's affidavit, also, is not competent evidence in this instance.

But if you look at the SOAH findings, if you look at the law on defamation dealing with substantial truth, dealing with privileges and dealing with actual malice, it's very clear that they can't meet their heightened burden of clear and specific evidence. All they have are inferences and suppositions being made by somebody who was not identified in the bulk of these broadcasts.

*THE COURT:* Mr. Bowen, is there anything else you want to add?

*MR. BOWEN:* Just briefly. I'll state it again. There's no evidence in the record that the State of Texas ever told the defendants that any money was unaccounted for, none. And once again, any poor record keeping, any financial mismanagement is not substantially true of the allegation that over three-and-a-half-million dollars ($3,500,000) in taxpayer money cannot be accounted for. There's nothing to tie that statement back to the State of Texas or its agency. It is made up wholly by the defendants, and its defamatory character and damaging nature is clear to anyone.

Thank you.

*THE COURT:* Okay. Let me do some noodling. I haven't read the last pleading that the defendants filed, so, let me look at that. And, then, depending what happens there, I suspect we'll have a couple other fights, either a similar fight or a jurisdictional fight, et cetera. So, let me deal with this. And, then, we'll figure out where to go from there.

All right. Have a good day, folks.

*MS. PRATHER:* Thank you, Your Honor.

*MS. ROBB:* Thank you.

*(We adjourned at 3:27 p.m.)*

STATE OF TEXAS

COUNTY OF HARRIS

I, Norma Alicia Duarte, Official Court Reporter in and for the 234TH District Court of Harris, State of Texas, do hereby certify that the above and foregoing contains a true and

correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $0 pauper's oath to THEOLA ROBINSON.

/S/NORMA ALICIA DUARTE

Norma Alicia Duarte, CSR

Texas CSR 7751

Official Court Reporter

234TH District Court

Harris County, Texas

201 Caroline, Room 1304

Houston, Texas 77002

Telephone: (713) 368-6354

Expiration: 12/31/12

21

# EXHIBIT C  AUDITS

**EXHIBIT C**

**2008-2009**

Charter District - School Accreditation

FIRST Per 19 TAC 109.1002 (e)

for Fiscal Year 2008-2009

CD Number
101820

Charter District: BENJI'S SPECIAL EDUCATIONAL ACADEMY

Charter Holder:        Benji's Special Educational Academy, Inc.

(A) The annual financial audit report was received within 180 days after Yes close fiscal year.

Fiscal Year August 3 I          Date Due:   2/27/2010        Date Received:      1/29/2010

(B) The annual financial audit report indicates assets 2 80% of liabilities. Yes

Total Assets:                                          $1,523.,837

Total Liabilities:                    $41,100

    80 percent of Total Liabilities:                    $335,280

Excess Assets over Liabilities:                        $1,188,557

(C) The annual financial audit report did not indicate a qualified or adverse opinion or an opinion disclaimed because of a scope limitation Rating Issued

limitation Assessment Issued

STANDARD ACHIEVEMENT              Yes

* In order to achieve a "Meets Standard", the charter school must receive a "Yes" on all of the above indicators. The rating is "Substandard" if the charter school receives a "No" on any of the above indicators. If no audit report is received, the rating is "Suspended-Data Quality".

## EXHIBIT C

### AUDIT 2007-2008

Charter School Accreditation

Financial Review Per 19 TAC 97.1055 for Fiscal Year 2007-2008

CD Number
01820             Charter School: BENJI'S SPECIAL EDUCATIONAL
                  ACADEMY CHARTER SCHOOL

Charter Holder:   Benji's Special Educational Academy, Inc.

                                                    Yes

(A) The annual financial audit report was received within 180 days
after close of fiscal year.

Fiscal Year August 31     Date Due: 2/27/2009       Date received:       2/27/2009

(B) The annual financial audit report indicates assets 80% of          Yes
liabilities.

Total Assets:                                                          $1,552,289

Total Liabilities:                                        $469,417

80 percent of Total Liabilities:                                       $375,534

Excess Assets over Liabilities:                                        $1,176,755
(C) The annual financial audit report did not indicate a qualified
or adverse opinion or an opinion disclaimed because of a scope

limitation Assessment Issued

MEETS STANDARD                        Yes

* In order to achieve a "Meets Standard", the charter school must receive a "Yes" on all of the above
indicators. The rating is "Substandard" if the charter school receives a "No" on any of the above
indicators. If no audit report is received, the rating is "Suspended-Data Quality".

Monday, July 13, 2009

# EXHIBIT D   TEXAS EDUCATION AGENCY EMAILS

# TEA EMAILS

## Exhibit D

Below are a few emails that was submitted in Mrs. Prather's brief. Other conspired emails are available to prove malice toward Benji's Special Educational and Theaola Robinson.

In a message dated 6/16/2009 3:59:04 P.M. Central Daylight Time, Jim.Thompson@tea.state.tx.us writes:
**The last time we talked you indicated that your directives were receiving grudging compliance but compliance. What else has happened? Is it time for us to consider further steps?**
Thompson, Jim; Rowell, Ronald, Taylor,
Shelley In a message dated *6/1/2009* 4:13:14 P.M. Central Daylight Time,
In a message dated *6/1/2009* 4:21:17 P.M Central Daylight Time
Jim.Thompson@tea.state.tx.us writes:
**I don't know or care about one or two months, but I am getting push back from Tritico and I don't see this as a smart fight. You can direct the second hiring when that time comes, and we will simply have more information-for example whether its breaking the budget. Unless we risk losing the person I don't get it. Is that agreeable to all? And yes, we could lose the person but then we would just be back to the same place we are now. ss**

From: Don Hooper [dhooper@cqL.net]
Sent: Wednesday, March 24, 2010 1:48 PM
To: Ronald Rowell
Subject: Re: I will do
Sent from my iPhone Dr Don Hooper
**On Mar 24, 2010, at 11:58 AM, Ronald",Rowell@tea.state.tx.us> wrote:**
**In the March monthly report you both need to list some points or all the points that you can identify where your efforts or directives have not been followed and use this as a reason on why you both are recommending an elevation in the sanction.**
RR

From: Rowell, Ronald
Sent: Tuesday, March 23, 2010 3:47 PM
To: dhooper@cgl.net
**Sounds like a good plan to me. Once we receive your report we will need to talk with the powers to be up here on what they think.**

1

CERTIFIED MAIL

THEAOLA ROBINSON
5505 JENSEN DRIVE
HOUSTON, TEXAS 77026

7014 2120 0000 2208 1215

RETURN RECEIPT
REQUESTED

U.S. POSTAGE
PAID
HOUSTON, TX
AUG 026
AMOUNT
**$9.21**
77002
R2305K131630-14
1000

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

AUG 05 2015

CHRISTOPHER A. PRINE
CLERK

FIRST CLASS

Christopher A. Prine, Clerk of the Court
First Court of Appeals
301 Fannin Street
Houston, Texas 77002-2066

RETURN RECEIPT
REQUESTED